# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 28, 2014 Session

## STATE OF TENNESSEE v. RODNEY EVANS

**Appeal from the Circuit Court of Claiborne County**
**No. 2008-CR-158    E. Shayne Sexton, Judge**

**No. E2013-00180-CCA-R3-CD**

FILED

APR 0 4 2014

Clerk of the Court
Rec'd by _____

Rodney Evans ("the Defendant") was convicted by a jury of driving under the influence. The trial court sentenced the Defendant to eleven months, twenty-nine days' probation after service of the forty-eight (48) hour minimum in confinement. On appeal, the Defendant argues that the trial court erred in denying his motion to suppress the results of the blood alcohol test. After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

T. Scott Jones, Knoxville, Tennessee, for the appellant, Rodney Evans.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Lori Phillips-Jones, District Attorney General; and LaTasha Wassom, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A Claiborne County Grand Jury indicted the Defendant on one count of driving under the influence. Prior to trial, the Defendant moved to suppress the results of his blood alcohol test.

On July 10, 2009, the trial court held a suppression hearing. Sarah Younce, a paramedic for Claiborne County Ambulance Service, testified that on May 20, 2008, she

responded to an accident on Highway 63. When she arrived, she observed a vehicle on its side across a guardrail. She removed from the vehicle a male whom she identified as the Defendant. Younce explained that she had to transport the Defendant from the scene of the accident to the "landing zone" where the Defendant was transported to the hospital by helicopter.

Younce did not recall seeing law enforcement at the scene of the accident. Regarding the Defendant's condition, Younce stated that he was alert and speaking with her but that "his left leg was severely mangled . . . below the knee." Younce did not administer any medications to the Defendant other than "normal saline." The Defendant told Younce that he was "going fishing" at the time of the accident. On cross-examination, she agreed that the Defendant did not specify whether he was coming or leaving from fishing. Younce confirmed that she did not smell or observe any alcohol at the scene.

Trooper Bobby Bullington with the Tennessee Highway Patrol testified that on May 20, 2008, he was stationed in Grainger County and was notified of a car accident on Highway 63. When he arrived at the scene, "a county deputy came over to [his] patrol car with a gun box and a badge." Trooper Bullington stated that the badge belonged to a Tennessee Highway Patrol trooper out of Knox County, whom he later identified as the Defendant. He never located the gun belonging with the gun box. According to Trooper Bullington, the vehicle involved in the accident was an overturned Dodge pickup truck pulling a bass boat. When asked whether he observed any alcohol at the scene, he responded, "There were some cans around the immediate area of the vehicle; didn't know if it belonged to the vehicle, but there was empty cans laying there while we were looking. We didn't notice any can or any beer or alcohol until we turned the vehicle back over, and then 18, I believe, had fell out of it – 18 cans." Trooper Bullington testified that he called his sergeant and informed her about the gun case and that he had observed "some cans laying around the vehicle."

Trooper Bullington agreed that he never saw the Defendant at the accident scene. On cross-examination, he confirmed that this accident was a one-car accident.

Sergeant Tracy Barrett with the Tennessee Highway Patrol testified that she had known the Defendant prior to this accident. She testified regarding the day of the accident,

When Trooper Bullington arrived, he called me to let me know that we had an off duty trooper involved in a crash. He said that it was bad, he didn't know how bad, that the trooper had been air lifted out. He had been given a gun – an empty gun case, maybe – maybe an ID or a badge . . . . I contacted our administrative lieutenant to let him know, and I headed down to the hospital, and our administrative lieutenant contacted the captain from the

Knoxville district to get somebody down there to be with [the Defendant] when he arrived.

When asked why she went to the hospital, Sergeant Barrett responded, "Initially because we had a trooper involved in a bad crash. We didn't know how bad he was." By the time she arrived at the hospital, Trooper Bullington had informed her that alcoholic beverages were at the scene of the accident. Sergeant Barrett testified,

> We went in to talk to [the Defendant]. I spoke with him briefly, checking with him about whether or not the gun was present and told him that we had found the gun case; asked him what had happened. He stated that a car had pulled out in front of him and that when he slammed the brake on, he lost control, he was pulling a boat, things of those [sic] nature. And then I told [the Defendant], I said, you know, "I'm here to obtain blood, that's what I'm here for, would it be okay." He mumbled something. He had a mask on, so I wasn't real clear on what he said. And I told him, . . . "[Defendant], I apologize. I didn't hear you very well. Would it be okay if we take blood," and at that point, he kind of reached up, knocked the mask off his face and he said yes.

The Defendant informed Sergeant Barrett that his gun was at home and that he might have been driving five miles per hour over the speed limit.

Sergeant Barrett noticed that, when the Defendant took off his mask, "[t]here was an obvious odor of alcoholic beverages." She estimated that her interaction with the Defendant lasted approximately fifteen to twenty minutes. She witnessed the lab draw the Defendant's blood, and she took possession of the blood and submitted it for analysis. Sergeant Barrett identified a toxicology request which indicated that the blood was drawn at 9:43 p.m. According to Sergeant Barrett, Lieutenant Ogle and some of the Defendant's family members were present during this interaction.

Sergeant Barrett confirmed that she was present when the doctor informed the Defendant about his prognosis. She stated,

> The doctor came over and was talking to [the Defendant] and told him that there was a possibility that they may have to take his leg off. I personally noticed that his blood pressure on the monitor shot up at that point, which he – naturally, you know, hearing the bad news. His mother was very upset by that – I believe his mother – a family member, and he told her, you know, don't worry about it, it'll be okay.

On cross-examination, Sergeant Barrett acknowledged that, when she first arrived at the hospital, a nurse had told her that she would not be able to see the Defendant because he was about to enter surgery. However, she eventually was able to speak with him prior to his surgery. She also confirmed that she did not read to the Defendant the Tennessee Implied Consent Law. She noted, however, that she would have read it to him had he declined permission to draw his blood.

Sergeant Barrett confirmed that the records from the Tennessee Highway Patrol indicated that the Defendant's accident was at 6:00 p.m. and that the Defendant did not get his blood drawn until 9:43 p.m. On redirect examination, Sergeant Barrett stated that she did not arrest the Defendant on the evening of the accident.

Lieutenant Kimberly Ogle with the Tennessee Highway Patrol testified that on May 20, 2008, she received a call to go to the hospital where the Defendant had been taken following a car accident. She arrived at the hospital fifteen to thirty minutes prior to Sergeant Barrett's arriving and learned that the Defendant was in serious condition.

According to Lieutenant Ogle, she and Sergeant Barrett did not have the opportunity to speak with the Defendant until he was about to go into the operating room. She confirmed that she was present when Sergeant Barrett asked the Defendant for permission to draw his blood. Furthermore, she also confirmed that the Defendant was unable to sign the consent form for the blood draw.

On cross-examination, Lieutenant Ogle stated that she smelled alcohol on the Defendant when he took off his oxygen mask. She agreed that the odor was "extremely strong." The State asked Lieutenant Ogle, "Based upon your extensive contact with [the Defendant], there is not a shadow of a doubt in your mind that he understood what he was doing when he told Sergeant Barrett that she could take his blood on May the 20th, 2008, while he was at U.T. Hospital, is there?" Lieutenant Ogle responded, "Based on my personal opinion, I feel like he knew what he was saying to her, yes." When asked whether the Defendant appeared to understand the doctor's explanation of his prognosis, Lieutenant Ogle answered, "He – when he heard the doctor speak to his mother and I believe his ex-wife and clearly heard that he might be losing it, his facial reaction – he looked over at them and you could see basically fear in him at that point."

On redirect examination, Lieutenant Ogle acknowledged that she did not ask any medical personnel whether the Defendant was on any medications that "would have affected his ability to manifest consent or to give consent to any type of procedure."

The hearing on the motion to suppress was continued until September 14, 2009. At that hearing, Dr. Todd Nickloes testified that he currently was a trauma surgeon at the

-4-

University of Tennessee Medical Center in Knoxville, Tennessee. He stated that he treated the Defendant upon his arrival at the hospital. According to his notes, Dr. Nickloes "splinted [the Defendant's] left lower extremity with a conscious sedation utilizing Etomidate" at 7:50 p.m. He continued, "[A]s that [Etomidate] began to wear off, we gave him two milligrams of Morphine and two milligrams of Versed."

Regarding the effects of these medications, Dr. Nickloes testified,

> With the Etomidate, the Morphine and the Versed, he would be quite sedated. I could intubate him and put him on a ventilator with that medication, so I would say that he'd be unconscious. Now, the Etomidate has a relatively short acting half life, so within a matter of about 10 to 15 minutes, that would have worn off to a significant degree, however, the Morphine and the Versed would have remained.

According to Dr. Nickloes' records, the Defendant received the Morphine and the Versed at 8:20 p.m. Immediately before or contemporaneous with the Defendant's receiving those two medications, a nurse noted that the Defendant was confused. Dr. Nickloes acknowledged that at 9:30 p.m. a "blood product" consent form was administered for the Defendant. However, the form indicated, with regard to the Defendant, "the patient is unable to sign because the patient is sedated." Also at 9:30 p.m. the Defendant received a medication called Fentanyl, which Dr. Nickloes explained was a synthetic Morphine. He explained,

> It's used for pain control in a number of different instances as well as it does have some sedating effects and so, it's utilized for – for instance, we use it in patients who are intubated because it allows us to keep them in a sort of a fugue state or a state where they are able to follow some commands but generally unaware of what's going on around them.

Dr. Nickloes agreed that, with the administration of Fentanyl at 9:30 p.m., the Defendant would have been in a "fugue" state. Furthermore, in his professional opinion, he did not believe that the Defendant would have had the ability to consent to any type of medical procedure at approximately 9:40 p.m.

On cross-examination, Dr. Nickloes explained regarding one of his assessments of the Defendant,

> This is what's called a Glasgow Coma Score. We give each patient that comes in based on their best response at any time during the resuscitation. We evaluate three different categories, one being their eye motion, one being their

best motor response and the other being their best . . . verbal response. Fifteen is the highest score that you can get, and it doesn't necessarily mean that you are . . . as lucid as you and I are presently but that at some point in time, he knew that he was at a hospital, and he was able to open his eyes on his own, and he would move his arms and hands, his feet spontaneously, so I gave him a GCS of 15 which, as I said, is the highest score you can give on that scale.

According to Dr. Nickloes' report, the Defendant never lost consciousness. However, he testified,

> Many times when a patient is sedated, they will respond appropriately, one would think, during an interaction, but one of the medications that was given was Versed which is an amnestic, and what that means is that it causes one to forget. And we give it – we used to use it for colonoscopies where a patient would be alert enough and awake enough to follow our commands so if we ask them to roll onto their side or to lie still, that they would do those things, but they would be completely unaware that they had done these things, and they would have absolutely no memory of doing those things. So, Versed is one of those that he was given. And like I said, it is sedating and – and the Morphine is also sedating. So, while it may seem that he is responding appropriately, he may have actually no higher cognitive ability to understand what he's doing.

He continued that the Defendant's frontal lobe would not have been functioning to the point that it could process or remember a conversation. Dr. Nickloes agreed, however, that the Defendant's explanation as to where his service weapon was located would be indicative that his frontal lobe was functioning.

Dr. Philip G. McDowell, Jr., an orthopedic surgeon, testified that he amputated the Defendant's leg and had treated him regularly since that surgery. He identified his affidavit wherein he opined that the Defendant "was unable to give informed consent for surgery or any medical procedure due to the administration of pain medications immediately following the accident." Accordingly, the Defendant's mother signed the medical authorization for the amputation. Dr. McDowell agreed that, given the three medications the Defendant was taking, he would have been "confused." In Dr. McDowell's opinion, the Defendant would have been unable to provide any kind of informed consent "according to what [he] require[d] for [his] surgical procedures."

At the conclusion of the proof at the suppression hearing, the trial court stated,

[L]ooking at the testimony of each side, the doctors, in particular, Dr. McDowell was very informative as to why they seek informed consent. We're talking about [the Defendant] who was facing the amputation of an appendage. In a situation such as that, the medical profession wants to make sure that patients are fully advised of any forthcoming procedure. It's smart medicine and it's smart business. Absent an informed and cogent decision by a patient, procedures that – leaving life altering changes to patients will be left to people who are not required to bear the result of those changes. Because of that, it is of utmost importance that the physicians make sure that the questions are being answered properly by the patients that they are working on. In absence of that, they go to the next of kin or someone acting in their stead. . . .

But, the physicians' analysis and their questions are not persuasive on the issue of whether or not the defendant was unable to refuse. The most persuasive testimony in that regard was the officers who testified at the previous hearing. Officer Barrett who actually asked the questions and who actually asked for the blood draw carried on something of a conversation about the wreck, there was a question/ answer session that went on. The defendant . . . was able to relay information about the particular wreck. And then the ultimate question, can I take the – can I draw your blood, and he said – after some mumbling, removes his mask and says yes. But then Officer Ogle – the Lieutenant testified that she engaged in a conversation with [the Defendant] going even beyond the event that led to the injury, talking about teaching other troopers to fish – other law enforcement agent officers to fish. And finally, [the Defendant] said something to the effect of, do what you need to do.

Finally, . . . one of the most telling parts of this is that this particular officer was educated in the nuances of the implied consent law. He had the opportunity through prior training to understand what . . . the impact of the request to draw the blood, that he . . . would actually be held probably to a higher level than an ordinary citizen would have. There is not one shred of testimony that indicates he had hesitance or that he had any questions or that he had any . . . misunderstandings about what request was made. I'll give the defendant – certainly, there was a great deal of medication in his system at the time. He was given pain blockers, given opiates, given Benzodiazepines for all manner of injury that he had sustained, but I'm certain this was a very traumatic event. But in this Court's opinion, there is not any evidence to show that the defendant was unable . . . to refuse to . . . that blood draw, so the Motion to Suppress is overruled.

Thus, the trial court denied the Defendant's motion to suppress.

The Defendant requested permission to appeal the trial court's denial of his motion to suppress, and the trial court granted the Defendant's request. However, this Court denied the Defendant's request to appeal the trial court's ruling, stating that the Defendant had failed to establish the need for immediate review of this issue.

At the jury trial, Sarah Younce, a paramedic with Claiborne County Ambulance Service, testified consistently with her testimony at the suppression hearing.

Trooper Bobby Bullington with the Tennessee Highway Patrol also testified consistently with his testimony at the suppression hearing. Additionally, he stated that they secured the scene, meaning that they did not allow anyone inside or near the crashed vehicle. He explained that the vehicle was "propped up" because it was in an unstable position. For that reason, he did not get in or try to thoroughly investigate the vehicle. The State asked him when he might have suspected alcohol as a factor in the accident, to which he responded, "There was a few empty beer cans in front of the vehicle here, and I advised my sergeant that it might have been just beer cans laying on the side of the road, but I said there was beer cans laying at . . . and in the vicinity of the vehicle." Furthermore, when the wrecker began moving the truck, a case of beer fell out of the back of the truck. He explained that the beer in the front of the vehicle was the same kind of beer that had fallen out the back. Trooper Bullington confided that this accident was emotionally charged because the Defendant was "one of [their] own" and that he did not want alcohol to be a factor in this accident. On cross-examination, he agreed that no forensic analysis had been taken of the beer cans found at the scene. On redirect examination, however, he also agreed that he could not remember a time when beer cans had been submitted for forensic analysis under such circumstances.

Trooper Chris Moore, a member of the Critical Incident Response Team with the Tennessee Highway Patrol, testified as an expert in accident reconstruction. On May 20, 2008, he received a call to respond to the scene of a serious car accident involving the Defendant. Upon his arrival, Trooper Bullington informed him about the details identified thus far, and Trooper Moore began taking pictures of the scene. He confirmed that he observed alcohol at the scene. When he looked inside the vehicle, he observed beer cans "in the driver's side between the driver's side door area and the seat area." He identified four pictures depicting the scattered beer cans. He stated that he observed a total of six empty beer cans inside the vehicle prior to the vehicle's being flipped over. When the wrecker flipped over the vehicle, "a case, a 24-pack of Natural Ice fell out the vehicle. The – of those 24, 18 were unopened – were full.

On cross-examination, he agreed that the accident occurred at approximately 7:00 p.m. and that he did not arrive at the accident scene until 10:06 p.m. Therefore, he acknowledged

that he could not know exactly what the scene looked like from the time of the accident until the time of his arrival. He also noted that the pictures he took of the beer cans inside the vehicle were taken just before midnight.

Sergeant Tracy Barrett with the Tennessee Highway Patrol testified that she sent Trooper Bobby Bullington to the scene of a car accident on May 20, 2008. Within minutes of Trooper Bullington's arrival at the scene, he called Sergeant Barrett to inform her that another trooper had been injured in the accident. Sergeant Barrett began driving to the hospital "to make sure [the Defendant] had all the support that [they] could muster for him." Based on communication that she had with Trooper Bullington, however, once she arrived at the hospital, the purpose for her presence was "to request and withdraw blood" from the Defendant.

Regarding her interaction with the Defendant at the hospital, she stated,

I spoke to him briefly about the crash and told him that I was there to obtain blood. He indicated that he understood that. I asked him if it would be okay if we took his blood. He had a mask covering his face, and I really was not able to understand him the first time, then I told him, . . . I'm sorry, I didn't understand what you told me, is it okay if we take your blood. At that point, he knocked the mask off of his face and told me yes, that, you know, we could take his blood.

When the Defendant took the mask off of his face, Sergeant Barrett noticed "[a] very obvious odor of an alcoholic beverage." Sergeant Barrett did not read to the Defendant the Implied Consent Form because she did not want to cause additional embarrassment with the family present but also because the Defendant permitted the blood draw, which eliminated the need for the implied consent. She did not have the Defendant sign the consent form. According to Sergeant Barrett, she witnessed the Defendant's blood getting drawn and submitted the blood into evidence.

Sergeant Barrett testified that the Defendant told her the following about the accident: "He told me that a vehicle had pulled out in front of him and he swerved to miss her and that when – I believe he indicated he might have been going about five miles an hour over the speed limit, just general stuff."

On cross-examination, Sergeant Barrett stated that, when she learned that a trooper out of the Knoxville district was in a car accident, she called someone within that district to request that someone from that district meet the Defendant at the hospital "in support of him." She confirmed that the only information she received regarding the accident scene came from Trooper Bullington.

Sergeant Barrett also confirmed that, when she first arrived at the hospital, a nurse told her that she could not see the Defendant because he was being prepared for surgery. However, Lieutenant Ogle, who had arrived prior to Sergeant Barrett, spoke with someone else at the hospital, and the two officers were able to speak with the Defendant prior to his surgery. She agreed that the blood draw request was at 9:43 p.m.

Lieutenant Kimberly Ogle with the Tennessee Highway Patrol testified that on May 20, 2008, she was informed that a trooper, the Defendant, had been involved in an accident. She arrived at the hospital where the Defendant had been taken prior to Sergeant Barrett's arrival. Eventually, Lieutenant Ogle and Sergeant Barrett were permitted to see the Defendant after first being told that he was about to go into surgery and could not have visitors.

Lieutenant Ogle testified to the following regarding their interaction with the Defendant:

> We spoke about he was going to a fishing tournament at the time of the crash, and I asked him how he had been doing at the tournaments . . . this year and he stated he had done pretty good, and we talked about one of our other troopers that actually fishes in tournaments and stuff. I was aggravating him about, well, maybe you need to teach him how to do some fishing so he'll finally win one.

Lieutenant Ogle recalled that she smelled an odor of alcohol on the Defendant when he removed his oxygen mask at some point. On cross-examination, Lieutenant Ogle confirmed that the oxygen mask came off after Sergeant Barrett had been questioning the Defendant regarding the blood sample.

Kathy Henard, employed with the district attorney's office in Claiborne County, testified that she previously had met the Defendant through his employment at some point with the Claiborne County Sheriff's Department. On June 9, 2008, the Defendant called Henard to discuss this case. In this call, the Defendant asked Henard to speak with the assistant district attorney who was assigned to the Defendant's case, to which Henard refused. She stated, "[H]e told me that he was not intoxicated that night, that he had bought 24 beers and he had only drank six of them." He confided to Henard that he believed Trooper Chris Moore was "gunning for him." The Defendant called Henard on another occasion and told her that he believed that the assistant district attorney in this case also was "gunning for him." She responded that she felt that the assistant district attorney simply was trying to do his job. Henard agreed that the Defendant is her friend and that she did not want to be testifying as a witness at his trial.

Linda Wilder, a forensic technician with the Tennessee Bureau of Investigation ("TBI") Knoxville Regional Crime Laboratory, testified that she received a blood alcohol kit on May 20, 2008. She confirmed that the kit was in a sealed condition upon receipt and stated that she placed the vials in the refrigerator vault until testing. In this case, the blood vials were released to a scientist named David Brown on June 3, 2008.

David Brown, a forensic scientist with the TBI in May and June of 2008, testified as an expert in the field of toxicology. He confirmed that he received the Defendant's blood sample on June 4, 2008, for testing. Following blood alcohol analysis on the sample, he determined that the Defendant's blood sample contained 0.19 gram percent ethyl alcohol. Brown stated that medications administered to the Defendant would not have affected his blood alcohol level. He confirmed that nothing about the sample indicated that it had been "corrupted" in any way.

At the conclusion of the trial, the jury found the Defendant guilty of driving under the influence. Following a sentencing hearing, the trial court sentenced the Defendant to eleven months, twenty-nine days' probation after service of the forty-eight (48) hour minimum in confinement. The Defendant subsequently filed a motion for new trial, challenging the trial court's denial of the Defendant's motion to suppress. The trial court denied the motion, and the Defendant timely appealed.

## Analysis

*Motion to Suppress*

When conducting a review of the trial court's determinations from a suppression hearing, we may consider the evidence adduced at the suppression hearing as well as evidence introduced at trial in determining whether the trial court properly denied the motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). Questions regarding the witnesses' credibility, "the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, we will uphold the trial court's factual findings unless the preponderance of the evidence is otherwise. Id. However, where the trial court has applied the law to the facts, we will conduct a *de novo* review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Because the State is the prevailing party, it is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures.

-11-

State v. Ingram, 331 S.W.3d 746, 754 (Tenn. 2011) (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961)).[1] Accordingly, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (quoting State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). Thus, when a search or seizure is determined to be illegal, the evidence obtained in that search or seizure is excluded from use by the prosecution. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996). This exclusionary rule "was designed to protect Fourth Amendment guarantees by deterring lawless searches, seizures, and arrests." Huddleston, 924 S.W.2d at 674.

There are several recognized exceptions to the rule against warrantless searches. Ingram, 331 S.W.3d at 755. Because a trial court must presume "that a warrantless search or seizure is unreasonable," it is the State's burden to establish "that one of the exceptions to the warrant requirement applied at the time of the search or seizure." Samuel L. Giddens v. State, No. M2006-01938-CCA-R3-PC, 2008 WL 271967, at *3 (Tenn. Crim. App. Jan. 29, 2008) (citing Yeargan, 958 S.W.2d at 629). The most common of these exceptions include: (1) a stop and frisk situation; (2) a search incident to a lawful arrest; (3) consent to search; (4) probable cause to search with exigent circumstances; (5) hot pursuit; and (6) plain view. State v. Day, 263 S.W.3d 891, 901 n.9 (Tenn. 2008) (citations omitted). Courts are admonished to keep these recognized exceptions to the warrant rule "'well-delineated,' 'jealously and carefully drawn,' and 'narrowly' defined." Ingram, 331 S.W.3d at 755 (citations omitted).

The State asserts in its brief that the Defendant has waived all issues on appeal by failing to cite to the record in the argument portion of his brief. See Tenn. Ct. Crim. App. 10(b). After reviewing the Defendant's brief, we find that the Defendant included ample references to the record in his argument section. Therefore, the State's argument on this point lacks merit, and we will address the substance of the Defendant's argument. Here, the Defendant contends that he did not give valid consent to the blood test, given the medications that he was taking at the time he consented to the blood test. Furthermore, he claims that, if his express consent was not valid, the results of the test should be suppressed because the

---

[1] The Fourth Amendment is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Mapp, 367 U.S. at 655; Ingram, 331 S.W.3d at 754. The intent and purpose of article I, section 7 of the Tennessee Constitution is identical with the Fourth Amendment; however, our Supreme Court has noted previously that Tennessee's search and seizure case law has developed independently from, and extends greater protection than, federal law. See State v. Richards, 286 S.W.3d 873, 877-78 (Tenn. 2009).

officers in this case did not comply with Tennessee's Implied Consent law. Accordingly, we first must determine whether the trial court erred in its finding that the Defendant gave valid consent to the blood test.

In order for a consensual search to be constitutional, "it must be 'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" State v. Cox, 171 S.W.3d 174, 184 (Tenn. 2005) (quoting State v. Simpson, 968 S.W.2d 776, 784 (Tenn. 1998)). "'[T]he existence of consent and whether it was voluntarily given are questions of fact' which require examining the totality of the circumstances." Id. at 184-85 (quoting State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999)). Courts look at several factors to determine voluntariness, including:

> (1) Time and place of the encounter; (2) Whether the encounter was in a public or secluded place; (3) The number of officers present; (4) The degree of hostility; (5) Whether weapons were displayed; (6) Whether consent was requested; and (7) Whether the consenter initiated contact with the police.

Id. at 185.

At the conclusion of the suppression hearing, the trial court found that the physicians' testimony regarding informed consent for medical procedures was "not persuasive on the issue of the whether or not the defendant was unable to refuse." The court stated,

> The most persuasive testimony in that regard was the officers who testified at the previous hearing. Officer Barrett who actually asked the questions and who actually asked for the blood draw carried on something of a conversation about the wreck, there was a question/answer session that went on. The defendant . . . was able to relay information about the particular wreck. And then the ultimate question, can I take the – can I draw your blood, and he said – after some mumbling, removes his mask and says yes. But then Officer Ogle – the Lieutenant testified that she engaged in a conversation with [the Defendant] going even beyond the event that led to the injury, talking about teaching other troopers to fish – other law enforcement agent officers to fish. And finally, [the Defendant] said something to the effect of, do what you need to do.
>
> Finally, . . . one of the most telling parts of this is that this particular officer was educated in the nuances of the implied consent law. He had the opportunity through prior training to understand what . . . the impact of the request to draw the blood, that he . . . would actually be held probably to a higher level than an ordinary citizen would have. There is not one shred of

testimony that indicates he had hesitance or that he had any questions or that he had any . . . misunderstandings about what request was made. I'll give the defendant – certainly, there was a great deal of medication in his system at the time. He was given pain blockers, given opiates, given Benzodiazepines for all manner of injury that he had sustained, but I'm certain this was a very traumatic event. But in this Court's opinion, there is not any evidence to show that the defendant was unable . . . to refuse to . . . that blood draw, so the Motion to Suppress is overruled.

The evidence does not preponderate against the trial court's findings. Sergeant Barrett testified that, when she spoke with the Defendant at the hospital, he explained to her "that a car had pulled out in front of him and that when he slammed on the brake, he lost control." The Defendant also informed Sergeant Barrett that his gun was at home and that he might have been driving five miles per hour over the speed limit. When Sergeant Barrett asked for the Defendant's permission for the blood test, he mumbled something that she was not able to understand. Upon asking him a second time, the Defendant removed his oxygen mask and said, "[Y]es."

Sergeant Barrett confirmed that she was present when the doctor informed the Defendant about his prognosis. She stated,

The doctor came over and was talking to [the Defendant] and told him that there was a possibility that they may have to take his leg off. I personally noticed that his blood pressure on the monitor shot up at that point, which he – naturally, you know, hearing the bad news. His mother was very upset by that – I believe his mother – a family member, and he told her, you know, don't worry about it, it'll be okay.

Lieutenant Ogle testified that she was present when Sergeant Barrett asked the Defendant for permission to draw his blood. The State asked Lieutenant Ogle, "Based upon your extensive contact with [the Defendant], there is not a shadow of a doubt in your mind that he understood what he was doing when he told Sergeant Barrett that she could take his blood on May the 20th, 2008, while he was at U.T. Hospital, is there?" Lieutenant Ogle responded, "Based on my personal opinion, I feel like he knew what he was saying to her, yes."

The Defendant, in asserting that he lacked the ability to give valid consent, relies heavily on the testimony of Dr. Nickloes and Dr. McDowell. We acknowledge that both doctors stated that, based on the medications the Defendant was taking, the Defendant was not able to consent to any type of medical procedure at the approximate time that Sergeant Barrett requested the blood sample. However, consent for law enforcement purposes and

-14-

medical purposes are based on two entirely different standards. See <u>Ferguson v. City of Charleston</u>, 308 F.3d 380, 395-97 (4th Cir. 2002) (distinguishing consent with regard to the testing of urine for law enforcement purposes versus medical purposes by discerning whether the patients knew that the testing was specifically for law enforcement purposes, given that medical personnel were the ones requesting consent). Accordingly, the Defendant's attempt to have this Court construe valid consent under the standard used for medical procedures is misguided.

Moreover, although Dr. Nickloes testified that, based on the medications the Defendant was taking, the Defendant's frontal lobe would not have been functioning to the point that it could process or remember a conversation, he agreed that the Defendant's explanations as to where his service weapon was located would be indicative that his frontal lobe, in fact, was functioning.

Thus, the trial court did not err in finding that the Defendant gave valid consent to the blood test. Therefore, we need not determine whether the officers complied with Tennessee's Implied Consent law, given that the Defendant gave actual consent in this case. As a result, we conclude that the trial court appropriately denied the Defendant's motion to suppress the results of the blood test. Accordingly, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

-15-

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 28, 2014 Session

## STATE OF TENNESSEE v. RODNEY EVANS

**Circuit Court for Claiborne County**
**No. 2008-CR-158**

FILED

APR 0 4 2014

Clerk of the Court
Rec'd by _____

**No. E2013-00180-CCA-R3-CD**

## JUDGMENT

Came the Appellant, Rodney Evans, by and through counsel, and also came the Attorney General on behalf of the State, and this case was heard on the record on appeal from the Circuit Court for Claiborne County; and upon consideration thereof, this Court is of the opinion that the judgment of the trial court should be affirmed.

It is, therefore, ordered and adjudged by this Court that the judgment of the trial court is affirmed, and the case is remanded to the Circuit Court for Claiborne County for execution of the judgment of that court and for collection of costs accrued below.

In the event the Appellant indicates an intention to file an application for permission to appeal to the Tennessee Supreme Court, he may be admitted to bail in the additional amount of $500 for a total bond amount of $1,500 with sufficient sureties to be approved by the clerk of the trial court pending filing and disposition of said application. In default of such bond, he shall be remanded to the custody of the Sheriff of Claiborne County.

The costs of this cause are taxed to the Appellant, Rodney Evans, for which execution may issue if necessary.

Jeffrey S. Bivins, Judge
James Curwood Witt, Jr., Judge
Norma McGee Ogle, Judge